**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **LUIS VILLAVICENCIO-SERNA, M29511,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | **No. 17 C 5442** |
| ) | |
| **MICHAEL MELVIN,** ) | **Judge Rebecca R. Pallmeyer** |
| ) | |
| **Respondent.** ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Armando Huerta was shot five times in the parking lot of his apartment complex during the early morning hours of Saturday, May 16, 2009. Addison police officers arrested Petitioner Luis Villavicencio-Serna on May 17 in connection with the shooting, and he was later charged with murder.[1] (Felony Complaint, Ex. A to State Court Record [9-1], 13.) Villavicencio-Serna's trial began on March 13, 2012. A DuPage County jury convicted him of first-degree murder on March 22. Through counsel, Petitioner Villavicencio-Serna filed a series of state court appeals and a post-conviction petition, all unsuccessful. (*See* Petition [1], at 1–3; Order, Ex. H to State Court Record [9-8].) Now serving a fifty-year sentence in state prison, Villavicencio-Serna petitions this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He seeks relief from his conviction on several grounds, including the alleged violation of his Fourth Amendment rights, ineffective assistance of counsel at all stages in the proceedings, the violation of his rights to due process, and the constructive denial of counsel. He also argues that the State failed to present evidence of his guilt beyond a reasonable doubt. Villavicencio-Serna's Fourth Amendment and due process claims are procedurally defaulted; the remainder of his claims are without merit. His petition is denied, but the court grants a certificate of appealability on the issue of sufficiency of the evidence.

---

[1] While the pre-sentencing report and original mittimus reflect an inaccurate arrest date of May 19, 2009, a judicial order later corrected that date to May 17. (Final Order, Ex. N [9-14].)

# BACKGROUND

## I.    Factual Background

Absent clear and convincing evidence to the contrary, the court presumes the "state court's account of the facts [to be] correct." *Coleman v. Hardy,* 690 F.3d 811, 815 (7th Cir. 2012) (citing 28 U.S.C. § 2254(e)(1); *Miller–El v. Dretke*, 545 U.S. 231, 240 (2005)).  The facts below are derived from the last state court opinion on the merits, *People v. Villavicencio-Serna*, 2014 IL App (2d) 120668-U, and from the record itself.  (*See* State Court Record, Exs. A–N [9].)

In the early morning hours of Saturday, May 16, 2009, Armando Huerta, Jr. ("Huerta") and Juan Carlos Marines Rojas ("Rojas") were sitting in a car in the parking lot of their apartment complex in Addison, Illinois, drinking beer and listening to music.  *Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 6.  "They stepped out of the car to smoke. They then decided to go in for the evening." [2]  *Id.*  Around 3:30 a.m., as they walked back to the apartment building, Rojas "heard a car pass by and gunshots." *Id.*  Multiple shots hit Huerta, who later died from his injuries. *Id.* at ¶¶ 6, 27.

Addison police arrived at the scene shortly after shots were fired.  *Id.* at ¶ 7.  Officers recovered five spent .22 caliber pistol shell casings.  (Goss Testimony, Ex. C [9-3], at 871:13–19, 872:14.)  Those shell casings were introduced into evidence at Petitioner's March 2012 trial as People's Exhibit 8, but no weapon was ever introduced.  (Goss Testimony, Ex. C [9-3], at 870:22–871:5; *id.* at 874:24–875:2 ("Q.  And no .22, no semiautomatic, no gun has ever been recovered from anyone?  A.  As far as I know.").))  An Addison detective testified at trial that he "did not know whether the shell casings were ever tested" for fingerprints or DNA, and the State presented no fingerprint or DNA evidence at trial.  *Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 40.

---

[2]      Neither the state court appellate opinion nor the trial transcript specifies what Rojas and Huerta were smoking.  (*See* Rojas Testimony, Ex. C [9-3], at 831:9.)  Villavicencio-Serna's petition characterizes the two as smoking marijuana, but nothing in the record supports that contention.

While investigating the crime, the Addison police first spoke with Rojas, who, at trial, admitted to being "a little drunk" on the night of the shooting. *Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 6. (*See* Rojas Testimony, Ex. C [9-3], at 840:13–15.) Rojas testified that he had drunk seven or eight beers over the three hours before the shooting. (Rojas Testimony, Ex. C [9-3], at 840:13–15.) He also testified that, immediately following the shooting, he told the police that he had seen a "dark blue or dark green Honda." *Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 6. (*See* Rojas Testimony, Ex. C [9-3], at 840:16–18.) He explains that he told the officers that the car had its headlights off, and that he only briefly saw a piece of the back of the car or the rear door.[3] (Rojas Testimony, Ex. C [9-3], at 833:24–834:2, 837:3–5, 850:11–15.) A couple of hours later, Rojas went into the police station and again told officers that the car was blue or dark green. (*Id.* at 844:24–845:2.) At that point he had sobered up "[a] little bit." (*Id.* at 844:5.)

Two days later, police officers, including one who interpreted for Rojas, took Rojas into the police station to have him identify the shooter's car. (*Id.* at 845:12–18 ("Q. . . . [The police] told you that they were bringing you [to the station] to identify a car; is that right? A. Yes.").) After he arrived at the station, they took him to a lot at the Addison public works building (Gonzalez Testimony, Ex. D [9-4], at 442:16–17), and Rojas identified a gray/silver Cadillac as the shooter's car, without police prompting.[4] (Rojas Testimony, Ex. C [9-3], at 848:11–19 (responding to a

---

[3]  In another portion of his testimony, Rojas states that he "remember[ed] the kind of the window" of the car. (Rojas Testimony, Ex. C [9-3], at 852:11–12.) Sergeant Goss of the Addison Police department was the first officer to arrive at the scene of the shooting. He explained, in response to a question about lighting in the parking lot, that "[t]here was exterior lights on the buildings themselves, some of the surrounding buildings as well." (Goss Testimony, Ex. C [9-3], at 862:20–21.)

[4]  That car was owned by Michael Daddio, who is discussed later in this opinion, on the night/morning of the shooting. Daddio then sold the car on May 16. Prior to trial, the trial court limited testimony about the car's sale to the fact that it was sold and the date of sale. (Ex. C [9-3], at 483:23–485:7.) Neither the prosecution nor the defense introduced evidence at trial describing how the police recovered the car after it was sold.

question on cross-examination: "Q.  When the police took you to the police station, there were cars in the lot?  A.  Yes.  Q.  Did they ask you to pick out any of those cars in the lot before you saw . . . the gray car - - silver car . . . [?]  A.  No."); *id.* at 848:23–849:3 ("Q.  They didn't show you a green car and ask if you had seen that before?  . . . A.  No.").)  Officer Gonzalez, who speaks both English and Spanish, testified that when they got to the lot, Rojas "immediately said, that's the car, that's the car, in Spanish," apparently signaling the gray/silver Cadillac  (Gonzalez Testimony, Ex. D [9-4], at 445:4–5.)[5]  Rojas testified that he "identified [the gray/silver car] because [he] remember[ed] the back, and [the] day [of the shooting] [he] couldn't see the color because it was dark."  (Rojas Testimony, Ex. C [9-3], at 838:7–9.)  Rojas identified a photograph of that same car in People's Exhibit 9 during the trial.

Following the shooting, the Addison police also interviewed Josephina Vasquez, who was 16 years old and dating Villavicencio-Serna in May 2009.  *Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 10.  Addison officer Dennis Kotlinski and his partner initially interviewed Vasquez on the evening of May 16 because her father had reported her missing.  Vasquez appears to have returned home after her father made the report; her father then brought her into the police department in connection with that report.  (Kotlinski Testimony, Ex. C [9-3], at 311:11–18 (explaining that Vasquez's father brought her to the police department at approximately 7:00 pm on May 16); *id.* at 313:9–11 ("Q.  The focus of that interview was on her status as a missing juvenile run-away?  A.  Yes.").)  "During the course of the interview, Kotlinski came to believe that Vasquez had information about a shooting that had occurred earlier that day," and the officers began to explore what Vasquez might know about the Huerta shooting.  *Villavicencio-Serna*, 2014

---

[5]      On cross-examination, Officer Gonzalez could not recall whether the lot had any green or blue green cars in it at the time Rojas made the identification.  (Gonzalez Testimony, Ex. D [9-4], 448:21–24.)  Nor could Rojas.  (Rojas Testimony, Ex. C [9-3] at 846:3–6 ("Q.  Was there one car that you had to pick from?  A.  No, there were like three more.  Q.  And what were the other car colors?  A.  I don't remember. . . .").)

IL App (2d) 120668-U at ¶ 28. (*See* Kotlinski Testimony, Ex. C [9-3], at 313:15–314:18.) Despite their suspicion, the officers "made no attempt to secure the clothing Vasquez was wearing . . . so that it could be tested for gunshot residue." *Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 29.

Vasquez lived in the same apartment complex as Huerta, but was dating Villavicencio-Serna at the time, and she testified at trial that Villavicencio-Serna disliked Huerta. (Vasquez Testimony, Ex. C [9-3], at 881:1–14, 909:5–9.) Huerta had called Vasquez while Vasquez was at Villavicencio-Serna's home about a week before the shooting. That call appears to have made Petitioner angry—he told Vasquez that "if [Huerta] kept on calling [her], that he was going to shoot him. . . . [T]o kick his ass, something like that. . . . [H]e said if he talks to you again, I'm going to shoot him." (Vasquez Testimony, Ex. C [9-3], at 910:17–23.) When asked if Petitioner "is jealous," Vasquez responded, "Yes, definitely he is." (*Id.* at 935:2–3.) *See Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 12. At trial, "[t]he State also played a voicemail message [Villavicencio-Serna] left on Huerta's phone six days before the shooting. In it, defendant directs a number of expletives toward Huerta." *Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 19.

Vasquez spoke to the police at the Addison police department over the course of two days, starting on the afternoon after the shooting. (Vasquez Testimony, Ex. C [9-3], at 899:2–4.) During that encounter, Vasquez initially told the police that Villavicencio-Serna "[d]id not do it." (*Id.* at 895:20.) By the end of the two days, however, Vasquez had provided two different video-recorded versions of her story, both implicating Villavicencio-Serna.[6] *Villavicencio-Serna*, 2014 IL App (2d)

_____

[6] The first version of Vasquez's statement was introduced as People's Exhibit 18 at trial and authenticated by Detective Pope, who participated in the interview. (Pope Testimony, Ex. D [9-4], at 6:5–15.) The prosecution played the recording for the jury, but the transcript does not contain the contents of the video. (Transcript, Ex. D [9-4], at 40:11.) The second statement was introduced across five DVD's—People's Exhibits 19, 20, 21, 22, and 23, evidently recordings of the full span of time where Vasquez remained in the questioning room at the station—and authenticated by Detective Maranowicz. (Maranowicz Testimony, Ex. D [9-4], at 35:10–24, 36:5–9.) These recordings, edited according to the court's evidentiary rulings, were played for the jury

120668-U, ¶ 11. The state played those recordings for the jury. The trial transcript does not reflect the recordings' contents, and this court has no copy of the recordings. Their contents are available to this court through witnesses' testimony about what they told police, the trial transcript, and the Illinois Appellate Court opinion.

In the first recording, Vasquez states that she stayed at Petitioner's house on the night of the shooting and went to bed at 2 a.m. Petitioner then left, and came back around 5 a.m., telling her that he "had taken care of business." *Id.* (*See* Vasquez Testimony, Ex. C [9-3], at 907:23– 908:17.) Vasquez stated on the video that she thought Petitioner had murdered Huerta. (Vasquez Testimony, Ex. C [9-3], at 914:7–9 ("Q. You told the police on that first video, that you thought the defendant murdered Armando? A. Yes, I did.").)

In the second recording (which is "actually a series of exhibits" and lasts for several hours), Vasquez "states that she drove to Addison with [Petitioner] and that [Petitioner] shot Huerta." *Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶¶ 11, 18. (Vasquez Testimony, Ex. C [9-3], at 904:23–905:4.) In that version of her statement, Vasquez implicates Michael Daddio as the driver of the car, Donald Rogers as a front-seat passenger in the car, and herself and Petitioner as the occupants of the back seat. *Id.* at ¶ 19. She states in the video that Petitioner had a gun in his waistband. *Id.*

At trial, Vasquez confirmed the details of these video recordings, but she explicitly recanted the second recorded version of her story, the one where she accompanied Villavicencio-Serna during the shooting. (*See, e.g.*, Vasquez Testimony, Ex. C [9-3], at 944:6–7 ("Q. Did you

_____

across two days. (Transcript, Ex. D [9-4], at 43:8–99:8.) Again, the transcript does not reflect the videos' contents. While not in the trial transcript, the contents of Vasquez' recorded statements are contained in the Illinois Appellate Court opinion, and Vasquez testified as to the contents of her recorded statements at trial. It is unclear from the appellate opinion whether that court conducted an independent viewing of the recordings or took the information from the trial record, including evidentiary hearings and side-bars held outside the hearing of the jury.

say that on the video?  A.  Because they told me [to,] I said that on the video.").)  Vasquez did not

directly recant the first version of her story, in which Villavicencio-Serna left her in his apartment

and returned after "taking care of business."  She testified at trial that she remained at Petitioner's

apartment throughout the entire night in question.  (*See, e.g.*, Vasquez Testimony, Ex. C [9-3], at

947:12, 950:7–8.)  She explained that she fell asleep at Petitioner's house on the night of the

murder, and that "when [she] fell asleep, he was with [her]."  (Vasquez Testimony, Ex. C [9-3], at

972:1.)  She also testified that she "w[o]ke up like around early in the morning, and he had his

jeans on for some reason and his clothes."  (*Id.* at 950:22–24.)

Throughout her testimony at trial, Vasquez asserted that she felt pressured into making

the recorded statements and that the police "told [her] what [she] had to say" in them.  *Id.*

(modifications in original).  (*See, e.g.*, Vasquez Testimony, Ex C [9-3], at 939:2–4 (Q.  On the

video did you say that you were sitting behind in the backseat behind the driver?  A.  [The police]

told me I was sitting there.").)  Vasquez explained that she "felt like [she] was getting threatened

by [the police] to tell them that [Petitioner] shot [Huerta]."  *Id.* at ¶ 11.  (Vasquez Testimony, Ex.

C [9-3], at 886:1–3; *see also id.* at 935:16–18 ("The first time when I first got [to the police station],

that was the truth.  And then [the officers] started harassing me telling me all this other stuff."); *id.*

at 891:21–24 (testifying that the interrogating officers told her that she "need[ed] to tell the truth,"

and that "if [she didn't] . . . that [she] was going to go to jail.").)  The second recorded statement,

particularly, "shows Vasquez in a room by herself for a time, crying," and the "jury [ ] view[ed]

portions where she is seen crying and throwing up."  *Villavicencio-Serna*, 2014 IL App (2d)

120668-U, ¶¶ 11, 18.  "Vasquez testified" at trial "that she [had] wanted to speak with her father,"

who had accompanied her to the police station, "but was not allowed to do so" during the

questioning.  *Id.* at ¶ 13.  Finally, she testified that she called "a telephone number the police had

given her to complain about the way she was treated" a few days after she was questioned.  *Id.*

at ¶ 13.

Michael Daddio and Donald Rogers, the alleged driver and passenger in the car, also testified at Petitioner's trial.[7]  The Addison police questioned Daddio on Sunday, May 17.  Daddio owned a silver 1993 Cadillac DeVille in May 2009,[8] and he, like Vasquez, gave a recorded video statement.  *Id.* at ¶ 20.  That statement lasted approximately twenty minutes and was played at trial for the jury.  (Daddio Testimony, Ex. D [9-4] at 185:7–11.)  *People v. Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 36.  Daddio testified that for several hours before the recording was made, he told officers that he was not involved in the shooting.  (Daddio Testimony, Ex. D [9-4], at 169:15–22,174:7–13.)  On camera, however, he told the police that on the night of Friday, May 15, he picked up Villavicencio-Serna and Vasquez with Rogers already in his car (*id.* at 147:17–22.); that Petitioner told him to drive around Addison, and then to go to Vasquez' apartment building[9] (*id.* at 148:12–18); that they arrived at the apartment building around 3:15 a.m. to 3:30 a.m. (*id.* at 149:22–150:4); that he heard four or five shots from the back seat of the car (*id.* at 150:24–151:2); and that after the shots, Villavicencio-Serna told him to drive away, and then directed Daddio to drive to Villavicencio-Serna's home.  (*Id.* at 151:3–10; 154:8–10.)

---

[7]      It is unclear whether Daddio or Rogers were ever charged in connection with Huerta's murder.

[8]      Daddio sold his Cadillac on May 16, 2009.  *People v. Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 20.  He testified that he wanted to sell it after it was damaged in a car accident several months earlier.  (Daddio Testimony, Ex. D [9-4], at 179:1–6.)

[9]      Daddio testified at trial that he noticed two people standing outside of Vasquez' apartment on the night of the shooting, even though he did not make that statement on the video recording, and even though he denied, at trial, being at the apartment that night at all.  (*See* Daddio Testimony, Ex. D [9-4], at 148:19–149:1 ("Q.  When you got to Josephina's apartment, did you notice two guys standing outside speaking Spanish?  A.  Yeah.  Q.  Did you tell the police that you noticed two guys standing outside speaking Spanish?  A.  No.  Q.  Had you ever seen those two guys before?  A.  No, I have not.  Q.  Did you tell the police that you had never seen them before?  A.  That's correct."); *id.* at 150:5–9 ("Q.  At [Vasquez'] apartment on that morning at [3:15 to 3:30 a.m.], did the two Spanish speaking individuals, were they standing near [Villavicencio-Serna's] side where he was seated in the vehicle?  A.  I was never there to know that.").)

Daddio's trial testimony about the early morning of May 16 differed greatly from the contents of his recorded statements. He testified that he could not recall what he was doing over the course of that Friday night and Saturday morning. *People v. Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 20. He also testified that he was "never there" at the scene of the shooting, and that Villavicencio-Serna did not shoot Huerta. (Daddio Testimony, Ex. D [9-4], at 150:9, 151:11–13.) He stated that he "was not with [Villavicencio-Serna] or Vasquez at any point on that day," *People v. Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 22, and he testified that the police "forced [him] to lie" on the video recording. (Daddio Testimony, Ex. D [9-4], at 139:11.) He testified, "[t]he police told me they would put me under arrest; they would - - they told me lots of things. They would take me away from my family. . . . And lots of other stuff; emotional stuff that was, like, very heartbreaking." (*Id.* at 193:13–21.) *People v. Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 20. He also testified that the police told him that "[t]hey were going to take me under arrest if I wouldn't help them close the case. They told me if I'd just cooperate they'd label me down as a witness, not an accomplice." (Daddio Testimony, Ex. D [9-4], at 162:24–163:3.)[10]

At two points during his questioning on May 17, Daddio got into a car with officers to visit separate locations. (*Id.* at 161:7.) On the first occasion, officers took Daddio to the apartment building where Huerta was shot. There, they asked him questions about the early morning of May 16. (*Id.* at 137:12–15.) On the second occasion, Daddio showed the officers to the home of Donald Rogers on the northwest side of Chicago. (*Id.* at 137:24–138:4 ("Q. Did you lead them to a location in Chicago? A. Yes, I led them to someone's house in Chicago. Q. Whose house did you lead them to? A. Donald Rogers.").) When the state asked Daddio on direct examination why he had taken the police to Rogers' home, Daddio testified:

---

[10]     Daddio also testified, for example, that the police were "yelling at me saying that stop lying to them; I'll be going to jail for life; that I was there [at the murder]; that they have lots of proof on it that I was there. . . ." (Daddio Testimony, Ex. D [9-4], at 141:2–6.)

> [The police] were telling me a little bit about the case, and they just had me there for hours telling me that I was part of the case, that they needed to put it together; they needed me to point out a second person that was also there. . . . I was there for hours with them until I finally, like, couldn't take it anymore. I just pointed someone out.

(*Id.* at 138:19–139:4.)[11] In reality, Daddio testified, he did not see Rogers until later on Saturday, May 16, when Daddio sold his Cadillac to someone off Craigslist. *Id.* at ¶¶ 20, 22. (Daddio Testimony, Ex. D [9-4], at 142:8–9.)

The Addison police picked up and interviewed Rogers on the night of May 17. (Rogers Testimony, Ex. D [9-4], at 239:10 (testifying that he was picked up around his uncle's house); Wadsworth Testimony, Ex. D [9-4], at 352:17–353:1 (stating that the police picked up Rogers "from his residence" around 9:05 p.m. on May 17).) In that interview, Rogers initially "denied being at Vasquez' apartment complex on May 16, 2009." *People v. Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 26. But later, while being recorded at the police station, he told the officers that he was with Daddio on the evening of May 15. (Rogers Testimony, Ex. D [9-4], at 240:5–8.) He told them that he and Daddio picked up Petitioner and Petitioner's girlfriend, that Villavicencio-Serna told Daddio where to drive, that they entered an apartment complex alley, that Villavicencio-Serna began arguing with another man, and that eventually he heard "boom, boom, boom, boom, boom." (*Id.* at 240:19–243:1.) *People v. Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 37. Rogers also told the Addison officers that Villavicencio-Serna threatened to shoot him if he told anyone about the shooting, and that Daddio took him home after the shooting. (*Id.* at 243:12–15, 245:7–16.) The prosecution played Rogers' recorded statement for the jury at trial. *People v. Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 37.

---

[11] There is no information in the record about what the officers and Daddio did there. There is no testimony, for example, that they exited the vehicle or attempted to speak to anyone at the residence.

At trial, Rogers recanted the recorded statements.[12]  He testified that he was with his girlfriend at her house from 10 p.m. to 4:30 a.m. during the night and morning of Huerta's shooting. *Id.* at ¶ 25.  By 5:00 a.m., Rogers says, he was "at [his] house sleeping." (Rogers Testimony, Ex D. [9-4], at 231:12–14.)  He testified that he slept until "[a]round 12:00 or 1:00 in the afternoon" on May 16, then he "relaxed at [his] house with [his] mom, and watched movies with [his] mom." (*Id.* at 234:24–235:3.)  Rogers' girlfriend at the time, however, testified that she was not with Rogers on the evening of May 15, 2009, nor was she with him on May 16.  (Williams Testimony, Ex. D [9-4], at 452:23–453:13.)  She also testified that Rogers never stayed at her house past 2:30 a.m. because she helped her father deliver newspapers.  (*Id.* at 453:23–454:19.)  On cross-examination, she could not remember the specific schedule for newspaper delivery.  (*Id.* at 457:22–24.)

Rogers, like Vasquez and Daddio, testified that he made the recorded statements, later recanted, because he was afraid of the police.  (Rogers Testimony, Ex D. [9-4], at 259:9–11 ("[T]he cops were telling me I was going to get 35 years because I was telling them I was with my girlfriend at the time."); *id.* at 261:16–17 ("[T]hey started yelling and hitting the desk."); *id.* at 261:23 (testifying that one of the officers "took [Rogers'] glasses off [Rogers'] head" during the questioning).)  Rogers' mother was suffering from cancer at the time, and he was concerned about the officers' warnings that he would never see her again.  *People v. Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 25 (noting that the officers "asked him if he wanted to see his mother again").  Rogers also testified that the officers brought Daddio and Vasquez into a room with him at the police station, and both Daddio and Vasquez "pointed at [him]" and said he was in the car.

---

[12]     See, for example, Rogers' trial testimony regarding his whereabouts on the night of Friday, May 15, 2009:  "Q.  Were you in the car with Michael Daddio, the [Petitioner], the [Petitioner's] girlfriend and yourself?  A.  No.  Q.  Did you tell Addison police detectives that you were in the car with Michael Daddio, the [Petitioner], and the [Petitioner's] girlfriend?  A.  Yes, I did."  (Rogers Testimony, Ex. D [9-4], at 240:23–241:6.)

(Rogers Testimony, Ex D. [9-4], at 260:5–6.)  Daddio nevertheless denied that the police told him what to say on tape.  Instead, "he stated that he made up" his recorded statements "by himself." *People v. Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 26.

More than a month later, on June 26, 2009, Rogers returned under his own will to the police station with his girlfriend "to provide additional information." *Id.* at ¶ 25.  He testified at trial that the police again told him they were going to arrest him after he arrived.  (Rogers Testimony, Ex D. [9-4], at 267:10–13 ("Q.  So after you willingly went to the Addison police department, they told you they're going to arrest you?  A.  Yes.").)  There is no suggestion the police had obtained a warrant, however, and having come to the station apparently of his own volition, Rogers was presumably free to leave.  (*See id.* at 266:2–13.)  He instead gave another recorded statement, telling the police that Villavicencio-Serna had threatened to shoot him if he told anyone what had happened.  (*Id.* at 265:16–22, 267:23.)  He did not recant any of the prior statements he had made to the police.  It does not appear from the record that this second video of Rogers was played for the jury; but Rogers testified at trial that he agreed to have his statements to the police recorded (*id.* at 266:15–19), and he testified consistently with the information he provided that day.  (*Id.* at 264:16–20, 265:1–5, 265:16–22, 267:18–23.)

The prosecution presented the testimony of a host of police officers, including Sergeant Goss, who responded to and investigated the crime scene, *People v. Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶¶ 7–9; Detective Pope, who interviewed Vasquez, *id.* at ¶ 15; Detective Maranowicz, who was assigned to "act on behalf of" Vasquez while she was questioned due to her juvenile status, *id.* at ¶ 16; Detective Selvik, who had briefly spoken with Vasquez and participated in the questioning of Daddio, *id.* at ¶¶ 23–24; Officer Kotlinski, who had also interviewed Vasquez, *id.* at ¶ 28; Officer Bjes, who took Rojas to identify the vehicle used in the shooting, as well as officer Gonzalez, who translated in English and Spanish for Bjes and Rojas, *id.* at ¶ 31; Officer Gilhooley, who participated in the questioning of Vasquez and who overheard

statements made by Petitioner when he was charged with murder,[13] *id.* at ¶ 34, (*see* Gilhooley Testimony, Ex. D [9-4], at 536:14–549:13); and Detective Brant, who was involved in the questioning of Rogers.[14]   (Brant Testimony, Ex. D [9-4] at 377:16–385:12.)   All officers denied subjecting Vasquez, Daddio, or Rogers to coercion, or knowing of any such tactics being used by their fellow officers.   *See also Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 30.

Several officers also testified on behalf of Petitioner, essentially confirming the absence of various forms of physical evidence tying Petitioner to the scene of the murder.   Detective Brant testified that he was unable to obtain any camera evidence from red light cameras, toll booths, or any other source that would place a "silver Cadillac in the relevant area on May 16, 2009."   *Id.* at ¶ 39.   Detective Reba testified that he did not know "whether the shell casings" found at the scene of the murder "were ever tested" for fingerprints or DNA.   *Id.* at ¶ 40.   Detective Hostetler testified that he tested the Cadillac for gunshot residue.   *Id.* at ¶ 41.   Though he never so explicitly stated so at trial, it appears from his testimony that no residue was found in or on the car.   (Hostetler Testimony, Ex. D [9-4] at 778:18–781:6.)   Hostetler explained, however, that a residue test could be ineffective if a car were cleaned, or if "the car had been driven with the windows open." *Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 41.   The parties stipulated that another forensic scientist had tested "residue samples taken from [Petitioner's] hands and from the interior of the Cadillac," and that "either a firearm was not discharged by [Petitioner] in the Cadillac or the residue had somehow been removed."   *Id.* at ¶ 42.

Villavicencio-Serna's theory of defense at trial was that another car entered the apartment complex parking lot during the early morning of May 16, and that the shooting occurred as a result

---

[13]     Petitioner was charged with first-degree murder on May 19, 2009 at the Addison Police Station.   (Felony Complaint, Ex. A [9-1], at 13; Defendant's Motion in Limine, Ex. A [9-1], at 220.)

[14]     Officer Brant also interviewed Maria Marines, who is discussed below. (Brant Testimony, Ex. D [9-4] at 858:22.)

of an altercation between Huerta, Rojas, and the occupants of that car. Petitioner presented evidence in support of this theory through the cross-examination of Officer Kotlinski and through his own witness, Maria Marines. Kotlinski testified that, as part of his investigation, he had learned of another car near the parking lot of the apartment complex around the time of the shooting. (Kotlinski Testimony, Ex. D [9-4] at 328:1–4.) That car had four occupants: Paul Alvarado, Daniel Garcia, David Vargas, and Maritza Padilla. *Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 29. Padilla lived in the apartment complex, and the car—a dark green Pontiac Bonneville—was dropping her off there around 3:30 a.m. *Id*. The police requested that all four come to the police station, but only Alvarado, Garcia, and Padilla complied. Kotlinski later located and spoke with Vargas as well. Kotlinski "did not test any of these individuals for gunshot residue because they were honest and forthcoming and had already left the scene when the shooting took place." *Id*. Cesar Padilla, Maritza Padilla's father, testified at trial that his daughter had "arrived home at about 3 a.m., though he did not know the exact time. He heard gunshots a short time after Maritza came home." *Id*. at ¶ 30.

Marina Marines was the last witness to testify at trial. She is Rojas' sister and also lived in the same apartment complex as Vasquez and Huerta. *Id*. at ¶ 43. Huerta was her nephew, and she was awake at the time of the shooting. *Id*. The appellate court summarizes her testimony:

> She heard a car pull up and stop. She also heard voices. Marines did not recognize a man who spoke, but she did recognize the voice of Maritza Padilla. Marines then heard what she described as "a bang towards the car," by which she meant a sound "like when you hit a car." She then heard Maritza yell. She then heard tires squeal and the car drive off. At the same time she heard the tires squeal, she heard a number of gunshots, "one after the other." There were "more than five" shots. She ran to a window and heard her brother yelling. She did not observe any other cars in the area while she was standing at the window.

*Id*. Marines testified that she chose to testify at trial, despite the fact that Petitioner's trial counsel had told her that she did not have to. *Id*. at ¶ 44. She was renting "an apartment from Vasquez's

father" at the time of trial.  *Id.*  She was interviewed by the Addison police after the shooting and appears to have given the same information to which she testified at trial.  *Id.* at ¶ 45.

After hearing testimony, the jury convicted Villavicencio-Serna of first-degree murder on March 22, 2012.

## II.    Post-Conviction Proceedings

Petitioner, through counsel, directly appealed his conviction to the Second Judicial District Appellate Court of Illinois.  He raised two challenges: (1) that the State failed prove him guilty beyond a reasonable doubt, and (2) that the trial court erred in admitting Vasquez, Daddio, and Rogers' videotaped statements into evidence.  (Defendant-Appellant's Brief, Ex. E to State Record [9-5], at 2.)  *Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 48.  The appellate court upheld Villavicencio-Serna's conviction on March 6, 2014, finding that he "was proven guilty beyond a reasonable doubt and that the trial court did not err in permitting the State to introduce videotapes of witnesses' prior statements into evidence."  *Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 1.  On the substantive issue, the court reasoned that the testimony of Vasquez, Daddio, and Rogers, taken together with the recorded statements, "provided an adequate and rational basis for the jury's verdict."  *Id.* at ¶ 55.  It added that "Rojas' identification of Daddio's car and the message left by [Villavicencio-Serna] on Huerta's phone" were additional evidence of guilt that the jury may have considered.  *Id.*  On the procedural issue, the court held that the recorded video statements were admissible as substantive evidence under 725 Ill. Comp. Stat. 5/115-10.1[15] and that the trial court did not abuse its discretion in admitting them.  *Villavicencio-Serna*,

---

[15]    That statute governs the admissibility of the prior inconsistent statements of witnesses: "In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if
        (a) the statement is inconsistent with his testimony at the hearing or trial, and
        (b) the witness is subject to cross-examination concerning the statement, and
        (c) the statement--
            (1) was made under oath at a trial, hearing, or other proceeding, or

2014 IL App (2d) 120668-U, ¶ 66. Villavicencio-Serna petitioned for leave to appeal ("PLA") to the Illinois Supreme Court on April 9, 2014, but the Supreme Court denied the PLA on September 4, 2014. (PLA, Ex. I [9-9]; Ex. J [9-10].)

October 27, 2014, Petitioner submitted a *pro se* post-conviction petition to the Clerk for the 18th Judicial Circuit Court. (*See* Proof of Service, Ex A. to State Record [9-1], at 499–500.) Petitioner claimed that: (1) his Fourth and Fourteenth Amendment rights were violated when he was arrested without probable cause (Ground I); (2) he was denied, in various ways, the effective assistance of counsel at trial and on appeal (Grounds II–VI, VIII); (3) by failing to disclose impeachment evidence, the prosecution denied his right to due process (Ground V); and (4) he was constructively denied counsel under *United States v. Cronic*, 466 U.S. 648 (1984) (Ground VII). On February 13, 2015, Judge Daniel P. Guerin of the Circuit Court of DuPage County quickly dismissed Petitioner's petition on the record, stating that the petition was "frivolous, patently without merit, I find it has no arguable basis in the law, and it is predicated upon a meritless legal

---

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and
   (A) the statement is proved to have been written or signed by the witness, or
   (B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding, or
   (C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording.

725 ILL. COMP. STAT. ANN. 5/115-10.1. The state appellate court determined that the recorded statements' admission at trial did not violate Section 5/115-10.1, *Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 66, and Petitioner challenges neither that ruling nor the constitutionality of Section 5/115-10.1 here. *See Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.") (modification in original) (internal quotation marks and citations removed).

theory."  (Ex. D. to State Record [9-4], at 1034:10–14.)[16]  The court denied Petitioner's request

for appointed counsel in the same proceeding.  (*Id.* at 1034:8–10.)

On February 25, 2015, Petitioner filed a Notice of Appeal for the denial of his petition and

again requested appointment of counsel.  (*Id.* at 556–58.)  Counsel was appointed, but raised just

one issue in the appellate brief: that the original mittimus in the case should "be amended to show

the correct arrest date in order to reflect the proper amount of pre-trial sentencing credit."  (Brief

and Argument for Pet.-Appellant, Ex. K [9-11].)  The mittimus showed an arrest date of May 19,

2009, and the brief argued that the date should be corrected to May 17, 2009.[17]  (*Id.*)  Counsel

raised no substantive challenges to Petitioner's conviction or sentence, nor did he address any of

the grounds in Petitioner's original mandamus petition.  Petitioner himself filed a motion seeking

substitute counsel and seeking leave to file his own supplemental *pro se* brief and argument[18]

(Motion for Leave to File Pro-se Supplemental Brief and Argument Pursuant to Pending Post-

Conviction Appeal, Ex. L [9-12]), but the Illinois Appellate court denied both requests.  (Order, Ex.

M [9-13].)  The court did not cite the state courts' rule against "hybrid representation," but this

court notes that Illinois courts, generally, have "long [ ] held [that] a defendant has no authority to

file *pro se* motions when he or she is represented by counsel."  *People v. Bell*, 2018 IL App (4th)

151016, ¶ 28, 100 N.E. 3d 177, 182, *reh'g denied* (Apr. 24, 2018) (citing, *inter alia*, *People v.*

---

[16]     The written order accompanying that ruling similarly stated that the petition was "frivolous, patently without merit, and based on a meritless legal theory."  (Ex A. to State Record [9-1], at 564.)  The court did not identify the legal theory it found meritless.

[17]     The arrest date reflected on the mittimus does not appear to have been challenged at trial nor on direct appeal.

[18]     Petitioner's *pro se* appellate brief argued that (1) his appellate counsel was not acting in his best interest, (2) he raised an adequate constitutional claim in his post-conviction petition, (3) he was not proven guilty beyond a reasonable doubt, (4) the witnesses against him at trial were not credible, and (5) he should have been granted an evidentiary hearing before his post-conviction hearing was dismissed.  (Motion for Leave to File Pro-Se Supplemental Brief and Argument Pursuant to Pending Post-Conviction Appeal, Ex. L [9-12].)

*Handy*, 278 Ill. App. 3d 829, 836, 216 Ill. Dec. 114, 664 N.E. 2d 1042, 1046 (1996)). The appellate court's ruling instructed that, if Petitioner wished to proceed without counsel, he should move for leave to do so. (Order, Ex. M [9-13].)

On January 9, 2017, the Appellate Court granted relief on the mittimus issue raised by Petitioner's counsel and ordered that the mittimus be modified to reflect the correct custody date of May 17, 2009. (Final Order, Ex. N [9-14].) The notice sent to Petitioner regarding the Final Order of the Appellate Court stated that the "mittimus is modified," and that the "matter has been returned to the jurisdiction of the Trial Court and the Judge previously assigned to this case." (*Id.* at 2.) There is no evidence in the record that Petitioner accepted the court's invitation to file a motion for leave to proceed without counsel. Further, Petitioner states that he sought to appeal the appellate court's order to the highest Illinois court, and that his PLA was denied on "about April 6, 2017." (Petition for Writ of Habeas Corpus ("Petition") [1], at 3.) The State, however, claims that "according to the Illinois Supreme Court Clerk, the court has no record of receiving a PLA" in this matter. (Resp. to Petition [10], at 6.) No PLA for the post-conviction petition, nor denial of a PLA, is included in the State Record, and Petitioner has presented no supporting documentation.

On July 26, 2017, Petitioner timely filed this § 2254 petition for habeas corpus. Petitioner seeks relief based on each of the grounds raised in his *pro se* first-stage post-conviction filing, and he adds one additional claim, arguing that the state failed to "meet its burden of proving . . . [him] guilty beyond a reasonable doubt." (Petition [1] at 57.) This is an issue that he raised on his direct appeal in state court. The State filed its response brief on October 17, 2017 [10]; Petitioner did not file a reply. For the reasons explained below, Villavicencio-Serna's petition is denied.

<u>**DISCUSSION**</u>

**I.     Procedural Default**

Section 2254 of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") empowers federal courts to "entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" only when that person's custody violates "the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The court cannot grant a writ of habeas corpus when the underlying claim was already adjudicated on the merits in State court

> unless the adjudication of the claim[ ] (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  "This standard is difficult to meet and highly deferential" to state courts. *Snow v. Pfister*, 880 F.3d 857, 864 (7th Cir.), *cert. denied sub nom*. *Snow v. Nicholson*, 138 S. Ct. 2637 (2018) (internal quotation marks and citations removed).  "Where the state courts did not reach a federal constitutional issue, 'the claim is reviewed de novo.'"  *Harris v. Thompson*, 698 F.3d 609, 623 (7th Cir. 2012) (quoting *Cone v. Bell*, 556 U.S. 449, 472, 129 S. Ct. 1769 (2009)).  And, "[w]hen no state court has squarely addressed the merits of a habeas claim, [the court] review[s] the claim under the pre-AEDPA standard of 28 U.S.C. § 2243, under which [it] dispose[s] of the matter as law and justice require."  *Harris*, 698 F.3d at 623 (internal quotation marks and citations removed).

Before reaching federal court, "a state prisoner must exhaust his remedies in state court." *Snow*, 880 F.3d at 864. (citing § 2254(b)(1)(a)).  This means that "[a] habeas petitioner 'must assert his federal claim through one complete round of state court review, either on direct review or in post-conviction proceedings.'"  *McGhee v. Watson*, 900 F.3d 849, 854 (7th Cir. 2018) (quoting *Bolton v. Akpore*, 730 F.3d 685, 694 (7th Cir. 2013)).  In Illinois, a "prisoner must include

his claims in a petition for leave to appeal to the Illinois Supreme Court" in order to fulfill his exhaustion requirement. *Snow*, 880 F.3d at 864 (citation omitted); *see O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (holding that a petitioner's "failure to present three of his federal habeas claims to the Illinois Supreme Court in a timely fashion has resulted in a procedural default of those claims"). This court will not entertain claims that have not been "fairly presented" to the state court. *Richardson v. Lemke*, 745 F.3d 258, 268 (7th Cir. 2014). Additionally, the federal district court "must consider which clams have been procedurally defaulted." *Snow*, 880 F.3d at 864. Procedural default occurs when "the state court denie[s] [claims] based on an adequate and independent state procedural rule."[19] *Crutchfield v. Dennison*, 910 F.3d 968, 973 (7th Cir. 2018), *cert. denied*, No. 18-1194, 2019 WL 1207013 (U.S. Apr. 15, 2019).

Two narrow exceptions permit applicants to bring claims in a § 2254 petition, even if they have been defaulted. "Procedural default may be excused . . . where the petitioner demonstrates either (1) cause for the default and actual prejudice or (2) that failure to consider the claims will result in a fundamental miscarriage of justice." *Snow*, 880 F.3d at 864 (quoting *Thomas v. Williams*, 822 F.3d 378, 386 (7th Cir. 2016)). "Cause is defined as an objective factor, external to the defense, that impeded the defendant's efforts to raise the claim in an earlier proceeding." *Johnson v. Foster*, 786 F.3d 501, 505 (7th Cir. 2015) (quoting *Weddington v. Zatecky*, 721 F.3d 456, 465 (7th Cir. 2013) (internal quotation marks omitted)). "Prejudice means an error which so infected the entire trial that the resulting conviction violates due process." *Johnson*, 786 F.3d at 505 (quoting *Weddington*, 721 F.3d at 465). The exception for fundamental miscarriage of justice

---

[19] Some Seventh Circuit cases draw a distinction between exhaustion and procedural default. *See, for example*, *Crutchfield v. Dennison*, 910 F.3d 968, 972 (7th Cir. 2018) (calling "the rule of procedural default [ ] an important corollary to the exhaustion requirement"), *cert. denied*, No. 18-1194, 2019 WL 1207013 (U.S. Apr. 15, 2019). Other cases consider a failure to exhaust to result in procedural default. *See Snow v. Pfister*, 880 F.3d 857, 864 (7th Cir. 2018) (explaining that the "second type of procedural default stems from the requirement that a state prisoner must exhaust his remedies in state court before seeking relief in federal court").

is even more exacting; "[t]he fundamental-miscarriage-of-justice exception applies only in the 'extremely rare' and 'extraordinary case' where the petitioner is actually innocent of the crime for which he is imprisoned." *Gomez v. Jaimet*, 350 F.3d 673, 679 (7th Cir. 2003) (quoting *Schlup v. Delo*, 513 U.S. 298, 315, 321–22 (1995)).

Villavicencio-Serna's claims for relief based on the Fourth Amendment and a denial of due process (Grounds I and V) are procedurally defaulted. Both of these claims were raised for the first time in Petitioner's post-conviction petition, which the DuPage County Circuit Court denied. (*See* Post-Conviction Petition, Ex. A to State Record [9-1], at 501; Ex. D to State Record [9-4], at 1034:8–14.) Counsel was appointed to appeal the denial of post-conviction relief, but that lawyer raised just one challenge—a challenge to the arrest date listed on Petitioner's mittimus. The appellate court ruled in favor of Villavicencio-Serna on that issue, but it denied his motion to file a separate *pro se* brief lodging additional challenges to his detention.[20] Because Petitioner's claims for relief based on the Fourth Amendment and denial of due process were not raised in any state appeal, they have not been through "a complete round of state court review" and are procedurally defaulted. *McGhee*, 900 F.3d at 854.

Petitioner is not excused from this procedural default. Villavicencio-Serna has made no actual innocence claim, and thus has no fundamental miscarriage of justice argument. *See Schlup*, 513 U.S. at 321–22. Construing the pleadings in his favor, he does raise a cause and

--------

[20]     The court's denial of Petitioner's motion stated: "[s]hould the appellant wish to proceed on his own, without court appointed counsel, he should motion this Court to do so." (Order, Ex. M to State Record [9-13].) As noted earlier in this opinion, Illinois law "disfavor[s] hybrid representation." *Clemons v. Pfister*, 845 F.3d 816, 820 (7th Cir.), *cert. denied*, 138 S. Ct. 501 (2017). In *Clemons*, a petitioner filed a § 2254 petition arguing that "his trial attorney was constitutionally ineffective . . . for failing to call an alibi witness" at trial. *Id.* at 817. However, he only raised that argument in his state proceedings once—in a *pro se* reply brief during the appeal of his post-conviction petition. Because the petitioner was represented by counsel during that appeal, "[t]he [Illinois] appellate court . . . refused to address" the claim in his *pro se* reply, citing its "enforcement of its rule against hybrid representation." *Id.* at 819. The Seventh Circuit then found that claim to be procedurally defaulted. *Id.* at 818.

prejudice argument; but that, too, fails. To prevail on a cause and prejudice theory, Petitioner must point to an "objective factor external to the defense" that prevented him from exhausting his Fourth Amendment and due process claims in state court. *Crutchfield v. Dennison*, 910 F.3d 968, 973 (7th Cir. 2018). The only external factors he points to are (1) the ineffective assistance of his trial counsel, who he argues failed to raise appropriate constitutional challenges, and (2) the ineffective assistance of his appellate counsel, who, on direct review, did not challenge trial counsel's ineffective assistance. In the abstract, ineffective assistance of counsel may constitute cause to set aside a procedural default. *See Martinez v. Ryan*, 566 U.S. 1, 11 (2012); *Davila v. Davis* 137 S. Ct. 2058, 2065 (2017) ("An error amounting to constitutionally ineffective assistance is 'imputed to the state' and is therefore external to the prisoner.") (citing *Murray v. Carrier*, 477 U.S. 278, 488 (1986)). As the court explains in Section II of this opinion, however, any claim of ineffective assistance of counsel in this case fails on the merits.

The court additionally notes that Petitioner's ineffective assistance of counsel claims may, themselves, be procedurally defaulted; they were not raised on direct appeal and were not exhausted in Petitioner's post-conviction proceedings. The Supreme Court has crafted a narrow carve-out for the procedural default of a claim of ineffective assistance of trial counsel, but that exception does not appear to help Petitioner here. *See Martinez*, 566 U.S. at 17 ("Where, under state law, claims of ineffective assistance of trial counsel *must* be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.") (emphasis added); *Trevino v. Thaler*, 569 U.S. 413, 417 (2013) (extending *Martinez* by holding that, even if a state technically permits ineffective assistance claims on direct appeal, federal habeas review of a defaulted ineffective assistance of trial counsel claim is permissible if the "structure and design of the [state] system . . . make[s] it virtually impossible for an ineffective assistance claim to be presented on

22

direct review).  *But see Crutchfield*, 910 F.3d at 976 (distinguishing the rules and procedures at play in *Martinez* and *Trevino* from those available to defendant-appellants in Illinois state court, and extensively reviewing the Illinois-specific procedures that enable criminal defendants to raise ineffective assistance of trial counsel claims on direct review); *Davila v. Davis*, 137 S. Ct. 2058, 2065–66 (2017) (clarifying that *Martinez* does not apply to defaulted claims of ineffective assistance of appellate counsel, and calling *Martinez* a "highly circumscribed, equitable exception" to the general rule that "in proceedings for which the Constitution does not guarantee the assistance of counsel at all, attorney error cannot provide cause to excuse a default").

Of course, Petitioner Villavicencio-Serna *did* raise ineffective assistance of trial counsel and appellate counsel claims in his *pro se* collateral filings.  But, he failed to exhaust those claims when his appointed appellate counsel failed to pursue those claims on appeal, and he has no cause to excuse their default under *Martinez* and *Trevino*.  Still, the court recognizes the complexity of this legal argument and the difficulty he had in presenting his ineffective assistance argument in the state postconviction appeal.  Because Petitioner's ineffective assistance of counsel claims fail on the merits, the court declines to determine whether they are procedurally defaulted.

## II.     The Merits of Petitioner's Claims

### A.     Fourth Amendment Claim

Petitioner claims that his "warrantless arrest was not supported by probable cause." (Petition [1], at 4.)  He argues that the statements of Rojas and Vasquez were insufficient to support his arrest, and that his "person, was and continues to be the 'fruit' of his illegal arrest." (*Id.* at 18–19.)  However, Petitioner makes no argument that he was deprived of a determination of probable cause after his arrest, and he was ultimately indicted by a grand jury.  (*See* Certificate of Impaneling of the Grand Jury, Ex. B [9-2], at 4); *Kaley v. United States*, 571 U.S. 320, 328 (2014) ("[A]n indictment fair upon its face,and returned by a properly constituted grand jury . . .

conclusively determines the existence of probable cause to believe the defendant perpetrated the offense alleged.") (internal quotation marks and citations omitted).  Petitioner was then convicted by a jury, and he received credit for his time served dating back to his date of arrest.  (*See* Final Order, Ex. N [9-14], at 1.)  His probable cause argument is without merit.

His "fruit of the poisonous tree" argument is simply a variation on that same argument and fails for the same reasons.  Further, no evidence was discovered nor admitted at trial stemming from his arrest, making any other reading of his "fruit of the poisonous tree" argument inapplicable here.  *See United States v. Swift*, 220 F.3d 502, 507 (7th Cir. 2000) ("Evidence which is obtained *as a result of* an illegal arrest is fruit of the poisonous tree.") (emphasis added).

### B.    Due Process Claim

Petitioner next claims that the prosecution withheld impeachment evidence pertaining to Rojas, "intentionally limit[ing] the cross-examination of its star witness."  (Petition [1], at 36.)  This appears to be a *Brady v. Maryland*, 373 U.S. 83 (1963) argument.  Under *Brady*, Petitioner must show "first, that the evidence at issue was favorable; second, that the evidence was suppressed; and third, that it was material to his defense."  *Socha v. Richardson*, 874 F.3d 983, 987 (7th Cir. 2017) (citing *United States v. Walker*, 746 F.3d 300, 306 (7th Cir. 2014)).  Petitioner here points to no actual impeachment evidence, beyond the evidence of Rojas' intoxication and contradictory car identifications, both of which were presented at trial.  There are no additional statements or affidavits from Rojas, nor any information from any other individual indicating that the State withheld information about Rojas or his testimony.  *See United States v. Williams-Davis*, 90 F.3d 490, 514 (D.C. Cir. 1996) (explaining that "it is unwise to infer the existence of *Brady* material based upon speculation alone") (citing *United States v. Ramos*, 27 F.3d 65, 71 (3d Cir. 1994); *United States v. Griffin*, 659 F.2d 932, 939 (9th Cir. 1981)).  *Cf. Sims v. Hyatte*, 914 F.3d 1078 (7th Cir. 2019) (reversing and remanding with instructions for the district court to grant a writ of habeas corpus, when an Indiana prosecutor admitted in state postconviction proceedings that the

24

star witness against the petitioner had been hypnotized before trial and Indiana courts found the evidence non-material). *See also, generally Mayle v. Felix*, 545 U.S. 644, 656 (2005) (noting the requirement that "habeas petitioners plead with particularity"). Nor is there evidence that Rojas had any undisclosed prior convictions, had committed any prior misconduct, had a reputation for untruthfulness, had been coerced to testify, or had been made promises of leniency in exchange for his testimony. (Petition [1], at 35–36.) *Cf. Giglio v. U.S.*, 405 U.S. 150 (1972) (reversing a lower court's conviction of a petitioner, where his coconspirator testified against him after being told by a government attorney that he, the coconspirator, would not be prosecuted in exchange for his testimony, and where information about that promise was never provided to Petitioner or the jury). Without any indications of what the impeaching evidence may have been, the court cannot determine that the evidence would have been favorable to Petitioner. His due process claim fails.

### C.       Ineffective Assistance of Counsel and "Constructive Denial of Counsel"

Petitioner brings six identifiable claims of ineffective assistance of counsel against his trial counsel and his counsel on direct appeal. He argues that his trial counsel failed to litigate his Fourth Amendment claim (Ground II); failed to "locate, interview, or hire an investigator to interview Juan Carlos Marines 'Rojas'" (Ground III, Petition [1], at 25; "failed to object to the admission and improper, damaging testimony of Rojas at trial" (Ground IV, *id.* at 30); failed to impeach Rojas (Ground V); "failed to seek impeachment evidence material from the prosecution or compel the prosecution to do so from the court" (Ground VI, *id.* at 38); and "failed to challenge [Petitioner's] treatment while in police custody as well as the other witnesses['] [treatment] [;] and challenge the tactics utilized by police which resulted in [their] confessions[,] leading to his arrest." (Ground VIII, *id.* at 45.) He challenges his appellate counsel's failure to raise each of these issues on direct appeal. Finally, he brings a cumulative claim arguing that his counsel was so ineffective as to result in an unconstitutional denial of counsel (Ground VII). Each of these claims fails.

25

The Sixth Amendment "guarantees [prisoners] effective assistance at both trial and during an initial appeal." *Davila*, 137 S. Ct. at 2072 (quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Evitts v. Lucey*, 469 U.S. 387, 396 (1985)). "To establish ineffective assistance of counsel, a petitioner must show (1) that his trial attorney's performance fell below an objective standard of reasonableness, and (2) that he suffered prejudice as a result." *Edmond v. United States*, 899 F.3d 446, 452 (7th Cir. 2018) (citing *Strickland*, 466 U.S. at 687–96). There is no specific test for reasonableness under prong one: "[t]o reflect the wide range of competent legal strategies and to avoid the pitfalls of review in hindsight, [a court's] review of an attorney's performance is highly deferential and reflects a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Groves v. United States*, 755 F.3d 588, 591 (7th Cir. 2014) (quoting *Yu Tian Li v. United States*, 648 F.3d 524, 527–28 (7th Cir. 2011)); *see Wiggins v. Smith*, 539 U.S. 510, 521 (2003) ("The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.") (quoting *Strickland*, 466 U.S. at 688). Under prong two, prejudice results when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "[A]t the heart of *Strickland*" lies the "constitutionally protected independence of counsel." *Wiggins*, 539 U.S. at 533; *see also Williams v. Lemmon*, 557 F.3d 534, 538 (7th Cir. 2009) ("It is essential to evaluate the entire course of the defense, because the question is not whether the lawyer's work was error-free, or the best possible approach, or even an average one.").

That same test applies to appellate counsel. *Lee v. Davis*, 328 F.3d 896, 900 (7th Cir. 2003). The analysis of objective reasonableness is, however, slightly different when assessing the representation of appellate counsel. When "appellate counsel [fails] to raise an issue on appeal," the court must "compare the issue not raised in relation to the issues that were raised; if

the issue that was not raised is 'both obvious and clearly stronger' than the issues raised, the appellate counsel's failure to raise the neglected issue is objectively deficient." *Id.* at 900–01 (quoting *Winters v. Miller*, 724 F.3d 1161, 1167 (7th Cir. 2001); *Williams v. Parke*, 133 F.3d 971, 974 (7th Cir. 1997)).

Under these standards, Petitioner's ineffective assistance of counsel claim based on his trial counsel's failure to raise a Fourth Amendment challenge to his arrest fails, just as it did on the merits. A reasonable professional would have recognized that a challenge to the probable cause for petitioner's arrest would have failed, and that no viable fruit of the poisonous tree argument existed. Appellate counsel was equally reasonable in declining to challenge trial counsel's determination on direct appeal.

Villavicencio-Serna's claim that his trial counsel should have interviewed Rojas prior to trial also fails. The court need not decide whether professional norms would have required trial counsel to interview Rojas because Villavicencio-Serna makes no showing that this failure was prejudicial.[21] *See Richardson v. U.S.*, 379 F.3d 485, 488 (2004) ("When the alleged deficiency is a failure to investigate, the movant must provide 'the court sufficiently precise information, that is, a comprehensive showing as to what the investigation would have produced.'") (quoting *Hardamon v. United States*, 319 F.3d 943, 951 (7th Cir. 2003)). Petitioner discloses that his

_____

[21] Petitioner cites two cases, in addition to *Strickland*, to support this argument. The first, *Gray v. Lucas*, 677 F.2d 1086 (1982) was decided by the Fifth Circuit before *Strickland*, and the court affirmed the lower court's denial of the petitioner's petition for habeas corpus. Therefore, the court will not address *Gray*. The Eighth Circuit affirmed a lower court's grant of a habeas petition in *Grooms v. Solem*, 923 F.2d 88 (1991), however. Petitioner Grooms there argued that he had been provided ineffective assistance of counsel, based on his trial attorney's failure to investigate alibi witnesses that petitioner identified shortly before trial. The court found that "trial counsel had a duty to attempt to investigate and to argue on the record for the admission of the alibi witnesses' testimony." *Id.* at 91. The court then found that counsel's failure was prejudicial to petitioner—the petitioner was able to "demonstrate[e] that the uncalled alibi witnesses would have testified if called at trial and that their testimony would have supported [his] alibi." *Id.* This second step, required under *Strickland*, is precisely what Petitioner Villavicencio-Serna is unable to do here.

attorneys, before trial, already knew that Rojas had been drinking beer on the night of the shooting and that Rojas gave inconsistent stories to the police regarding the color and make of the suspect's car. (Petition [1], at 26–27.) Rojas testified about both of those facts at trial, and, as explained above, Petitioner points to no other information that would have discredited Rojas. (*See, for example*, Rojas Testimony, Ex. C [9-3], at 831:3–12, 837:21–838:9, 843:16–845:2.) Petitioner attempts to cover that failure by arguing that, had his counsel interviewed Rojas, they would have "at least ascertain[ed] whether Mr. Rojas had any other information." (Petition [1], at 27.) However, this is purely conjecture; there is no evidence in the record, and no additional evidence submitted here, that would suggest that Rojas had any other information about Huerta's murder.

*Wiggins*, 539 U.S. 510, cited by Petitioner, illustrates this principle. In *Wiggins*, a capital case, defense counsel performed an "incomplete investigation" and thus failed to uncover and present evidence that the petitioner had suffered negative life experiences and severe abuse as a child. *Id.* at 533. The Court concluded that trial representation did not meet the standards of the Sixth Amendment because the petitioner obtained and presented a report from a social worker concerning his history, a report that might have been relevant to the sentencing decision but was not sought or used by his defense attorney. *Id.* at 535. Petitioner Villavicencio-Serna has presented no such evidence, and his claim that he was prejudiced by his attorney's failure to interview Rojas rests on mere speculation.

Nor is the court moved by Villavicencio-Serna's contention that his attorneys should have challenged the admission of Rojas's testimony. That testimony was obviously relevant, IL. R. Evid. Rule 401, and no more prejudicial than any other directly relevant testimony. Petitioner's concerns about Rojas' credibility may be well taken, but the credibility of witness testimony is for the jury to assess. *See People v. Gonzalez*, 2019 IL App (1st) 152760-U ¶ 34 ("It is the function of the fact finder, the jury here, to determine the credibility of the witnesses, the weight to be given

their testimony, and the inferences to be drawn from the evidence."). Thus, counsel's failure to challenge the admissibility of Rojas' testimony was reasonable under the professional standards. Because these claims fail against trial counsel, they fail against appellate counsel as well.

Petitioner next challenges his trial counsel's failure to impeach Rojas and his counsel's failure to seek impeachment materials from the prosecution. As explained above, it is unclear what impeachment materials Petitioner believes his counsel should have presented, besides Rojas' conflicting statements about the car, about which Rojas testified on both direct and cross-examination at trial. Without any understanding of how a failure to otherwise impeach Rojas could have been prejudicial to Petitioner, the court will not grant habeas relief on this ground. Reasonable appellate counsel acting in accordance with professional norms could have reached the same conclusion about trial counsel that the court reaches; therefore, appellate counsel was not ineffective in failing to raise these ineffective-assistance-of-trial-counsel claims on direct appeal.

Petitioner mentions the Confrontation Clause in a single sentence within his ineffective assistance of counsel claim regarding Rojas' impeachment. Petitioner claims that his "attorneys limited, by failure to receive, or compel impeachment material, the cross-examination of this star witness, that infringes on the constitutional right of confrontation."[22] (Petition [1], at 40 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679–80 (1986).) This claim is defaulted, just as his Fourth Amendment and Due Process claims are defaults; his Confrontation Clause claim also fails on the merits. The Confrontation Clause "guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.' " *Van Arsdall*, 475 U.S. at 678. While that "guarantees a defendant an opportunity for effective cross-examination, [ ] there is no guarantee of cross-examination to whatever extent[ ] the defense might wish." *United States v.*

---

[22]     Petitioner does not raise Confrontation Clause challenges to the testimony of Vasquez, Daddio, or Rogers.

*Recendiz*, 557 F.3d 511, 530 (7th Cir. 2009) (internal quotation marks removed) (quoting *United States v. Jackson*, 540 F.3d 578, 591 (7th Cir. 2008)). *Cf. Rhodes v. Dittmann*, 903 F.3d 646, 657 (7th Cir. 2018) ("[I]t is clearly established that a trial court violates the Confrontation Clause when it routinely applies Rule 403 balancing to limit cross-examination by the accused on issues central to the defense."). Here, Rojas was, in fact, cross-examined on issues central to Villavicencio-Serna's defense—the jury learned that Rojas was drinking the night of the shooting, that he initially identified the shooter's car as a blue or green Honda, and that he did not see any other cars enter the parking lot after midnight. (*See* Rojas Testimony, Ex. C [9-3], at 841:14–17.) Petitioner presents no evidence that Rojas should have been cross-examined on any additional subjects, and his cross-examination at trial put the jury on notice for reasons to question Rojas' credibility. *See Recendiz*, 557 F.3d at 530 ("The right to confrontation is not implicated where 'limitations on cross-examination did not deny the defendants the opportunity to establish that the witnesses may have had a motive to lie; rather, the limitations denied them the opportunity to add extra detail to that motive.' ") (quoting *United States v. Nelson*, 39 F.3d 705, 708 (7th Cir. 1994)).

To the extent that Petitioner seeks to challenge his trial counsel's failure to challenge the treatment of Vasquez, Daddio, and Rogers in by the Addison police, all three testified about their treatment by police at trial on both direct and cross-examination.[23] (*See, e.g.*, Vasquez Testimony, Ex. C [9-3], at 970:5–971:4; Daddio Testimony, Ex. D [9-4], at 168:5–22; Rogers Testimony, Ex. D [9-4], at 274:13–277:24.) Therefore, the court need not assess whether Villavicencio-Serna's trial counsel had standing to lodge any formal challenge to Vasquez, Daddio, and Rogers' treatment; a failure to do so would could not have been prejudicial to Petitioner. Insofar as Petitioner challenges his own treatment while in Addison police custody,

_____

[23]     Villavicencio-Serna's petition clearly states, however, that he "is in no way attempting to challenge anyone[']s constitutional rights but his own. He is only attempting to show police conduct, and the failure of his attorneys to challenge this issue." (Petition [1], at 50.)

nothing in the record indicates any mistreatment, and there was no suggestion at trial that he made any confession or incriminating statements to the police.[24] His claim against appellate counsel fails on the same grounds.

Finally, Petitioner claims that his counsel failed to "subject[ ] the prosecution's case to the 'crucible of meaningful adversary testing'" in violation of the Sixth Amendment. (Petition [1], at 42 (quoting *United States v. Cronic*, 466 U.S. 648, 657 (1984)).) The record simply does not support such an allegation. Petitioner's defense attorneys cross-examined each witness for the state; they questioned Rojas about his contradictory statements and his drinking on the night of the shooting; they elicited testimony from Vasquez, Daddio, and Rogers that their statements to the police were lies; they got those same three witnesses to testify about their mistreatment by the Addison police; they elicited testimony from Rogers' girlfriend that drew her credibility into question; they opposed the admission of Vasquez, Daddio, and Rogers' recorded statements; they called several witnesses to testify about the absence of physical evidence implicating Petitioner; and they offered plausible evidence in support of the theory that someone else murdered Huerta. The fact that the jury did not acquit petitioner based on this evidence does not equate to ineffective assistance of counsel.

*Cronic* also bears little relation to this case, and its outcome is unfavorable to Petitioner in any case. There, the counsel of a defendant indicted on mail fraud charges withdrew "[s]hortly before the scheduled trial date." *Cronic*, 66 U.S. at 649. The trial court then "appointed a young lawyer with a real estate practice to represent [the petitioner], but allowed him only 25 days for pretrial preparation." *Id.* at 640. After his conviction, the defendant raised a claim of ineffective

---

[24] Petitioner did not testify at trial, and the only mentions of his arrest throughout the entire trial came during the testimony of Josephina Vasquez, when she testified that she had not spoken with Petitioner since his May 17 arrest. (*See* Vasquez Testimony [9-3], at 969:4–6 ("Q. And you haven't spoken to Luis since he got arrested back on May 17th; is that correct? A. No, I haven't."); 982:12–14 ("Q. And you also told [Defense counsel] that you never talked to the defendant once he was arrested? A. No.").)

assistance of counsel in his habeas petition. The Tenth Circuit reversed the conviction, finding that the petitioner had been denied effective counsel under a test that focused solely on the circumstances surrounding the representation of the petitioner (such as the time allowed for trial preparation and the complexity of the defense), and not the representation itself. The Supreme Court reversed the Tenth Circuit, invalidating its test and emphasizing that a habeas petitioner "can [ ] make out a claim of ineffective assistance only by pointing to specific errors made by trial counsel." *Id.* at 666. In the present case, Villavicencio-Serna was represented attorney Ford for three years leading up to and through trial (*see, e.g.*, Ex. C [9-3], at 6), and he points to no specific error that supports a cognizable ineffective assistance of counsel claim. Petitioner's catch-all Sixth Amendment claim does not warrant a grant of a writ of habeas corpus.

### D. Sufficiency of the Evidence

Finally, Petitioner argues that the state failed to prove him guilty beyond a reasonable doubt in violation of the Fourteenth Amendment's due process clause. (*See* Petition [1], at 51 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).) He raised this claim through one full round of state court review, preserving it for federal habeas review.

"Sufficiency of the evidence is reviewed under a different standard on federal habeas review than on direct appeal before the state court. '[T]he state appellate court determines whether any rational trier of fact could have found the evidence sufficient; . . . a federal court may only overturn the appellate court's finding of sufficient evidence if it was objectively unreasonable.'" *Maier v. Smith*, 912 F.3d 1064, 1074 (7th Cir. 2019) (quoting *Saxon v. Lashbrook*, 873 F.3d 982, 988 (7th Cir. 2017)); *see Saxon*, 873 F.3d at 988 (explaining that the federal court "may only overturn the appellate court's finding of sufficient evidence if it was objectively unreasonable").

The court determines that the state court's ruling here was not objectively unreasonable. The appellate court recognized that it must "construe the evidence in the light most favorable to

the State and consider whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 50 (citing *People v. Sutherland*, 155 Ill. 2d 1, 17, 182 Ill. Dec. 577, 610, N.E. 2d 1 (1992). This is the appropriate standard. *Saxon*, 873 F.3d at 987. The appellate court then applied that standard, reviewing the evidence from trial that both supported and cut against the jury's determination. The appellate court specifically recognized Petitioner's theory implicating other individuals, but explained that

> to accept [Marina Marines'] testimony, the jury necessarily would have had to reject the testimony of [Rojas]. . . . The jury could have reasonably concluded that Rojas's testimony, since he was actually present in the parking lot, was entitled to more weight than that of his sister. In any event, resolving such conflicts is primarily for the jury.

*People v. Villavicencio-Serna*, 2014 IL App (2d) 120668-U, ¶ 54. The appellate court ultimately concluded that "the testimony of Vasquez, Daddio, and Rogers . . . provided an adequate and rational basis for the jury's verdict." *Id.* at ¶ 55. It also determined that "Rojas' identification of Daddio's car and the message left by [Petitioner] on Huerta's phone supported the jury verdict." *Id.* These determinations are not objectively unreasonable, and the court will not grant Petitioner's writ on sufficiency of the evidence grounds. *See Saxon*, 873 F.3d at 988; § 2254(d)(1).

The lack of any physical evidence in this case is troubling, however. Juan Rojas, who identified the shooter's car, admits he was drunk at the time of the shooting. Several witnesses recanted their prior incriminating statements and testified that they gave the statements in response to pressure or threats from law enforcement; video shows Vasquez in tears and physical discomfort during the time she gave her statements. It appears that law enforcement made good on assurances to Daddio that, in return for his incriminating statement (later recanted), he would not be charged. The court recognizes the very high bar set for a challenge to the sufficiency of the evidence, and believes that the state courts' analysis survives that challenge. The court concludes, however, that reasonable jurists might see this differentl. y28 U.S.C. § 2253(c)(2).

The court will grant him a certificate of appealability on that single issue. *See Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000) (explaining that, to obtain a certificate of appealability, a "habeas prisoner must make a substantial showing of the denial of a constitutional right, . . . includ[ing] showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further") (internal quotation marks omitted) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893, 893 n.4 (1983)).

## CONCLUSION

Villavicencio-Serna's Fourth Amendment and due process claims are procedurally defaulted. His claims for relief based on ineffective assistance of counsel and sufficiency of the evidence fail on the merits. Because "jurists could debate whether" the state appellate court correctly concluded that the evidence against Petitioner was sufficient to support his conviction, however, the court grants Petitioner a certificate of appealability on that issue. *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). Villavicencio-Serna's petition for a writ of habeas corpus is denied.


ENTER:


Dated: June 19, 2019                    _____
                                        REBECCA R. PALLMEYER
                                        United States District Judge